United States Center for SafeSport, and Ms. Tucker, whenever you're ready, we'll hear Good morning. May it please the Court. My name is Tamara Tucker from Charlottesville, Virginia, and I'm pleased to be here today on behalf of the appellants, plaintiffs Tom Navarro, Jim Giorgio, and Nina Schaffer. The principle that Congress cannot delegate away its vested powers exists to protect liberty. Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints. It would dash the whole business, the whole scheme, if Congress could give its power away to an entity that is not constrained by those checkpoints. The Constitution's deliberative process was viewed by the framers as a valuable feature, not something to be lamented and evaded. You're arguing that this is a government actor? Is that what you're saying? There's a non-delegation piece. State, the non-delegation, basically, therefore, it's state acting. Correct. There's overlap between the two concepts, for sure. That quote was from Justice Alito in Amtrak 1, which is one of the quintessential non-delegation cases. He also goes on to say that one way the government can regulate without accountability is by passing off a congressional operation as an independent, private concern. And given the incentive to regulate without saying so, everyone should pay close attention when Congress sponsors corporations that it specifically designates not to be agencies or establishments of the United States government. The United States Center for Safe Sport is exactly the type of entity, private entity, that Justice Alito described. In the 2018 amendments to the Ted Stephens Olympic and Amateur Sports Act, Congress granted to the center, quote, exclusive jurisdiction to make rules, policy, investigate, and adjudicate the conduct of millions of Americans, both in and outside of sport. What would you have us do with the Supreme Court's opinion in San Francisco Arts and Athletics? That's very distinguishable from this case. In what way? I mean, if the U.S. Olympic and Paralympic Committee is not a state actor, how could we hold that safe sport is? Well, for a number of reasons. Number one, the center was not in existence during the San Francisco Arts and Athletics case. Number two, and more importantly, the center sits above the U.S. Olympic Committee. It does Congress's bidding. The statute is far more complex now than it was before from the 2018 and 2020 amendments. And the center is doing things that are well beyond the conduct and coordination of amateur sports. So in San Francisco Arts and Athletics, that's what they talked about. And we're not here because somebody is unhappy with a referee's call. We're not here over a trademark issue like in San Francisco. We're here because Congress has delegated to a private entity sweeping authority over millions of Americans. And the conduct that it regulates does not have to have a nexus to sport. It can be conduct. It can be me in this courtroom because I'm a member of USEP. I'm under the jurisdiction of the center as we speak in addition to being under the jurisdiction of this court. And there's no oversight. So Congress has passed this sweeping legislation giving the center rulemaking and policymaking authority, giving it enforcement authority. What enforcement authority does it have except for enforcing the rules of the game? I mean, it basically says you can't be doping. You can't engage in sexual abuse. And we have all these problems in the Olympics that have shown up with sexual abuse and doping and other such things. That's really what is the purview is to make amateur sports fair and moral. And San Francisco sort of said these are not core government functions. They granted that authority to this federally chartered corporation. Well, Congress has gone beyond that now. Congress has gone just beyond eligibility. That's for sure the change in status under the Fifth Amendment. But Congress has said. Tell me what. Be specific. What do you mean? It seems to me they don't have subpoena power. They don't have enforcement power in a court except as private individuals. It seems to me they have the power to enforce their own membership, their own events, enforce the rules of the game. Well, one way they enforce it is by putting your name on the World Wide Web. I understand. But that's their way of announcing. I mean, the idea that somebody could be competing who has been doping, it's part of that effort to make the game clean. But the question I have is really it doesn't look like Congress wanted to get involved in that. It looks like Congress wanted to have the Olympic Committee and SafeSport take care of that. Actually, SafeSport was a spinoff initially of the Olympic Committee, wasn't it? That's correct. It was organized and formed by the U.S. Olympic Committee and then spun off into its own board of directors. But rulemaking and policymaking are separate functions from enforcement authority. But the enforcement is still, it's not, once somebody, if somebody didn't want to be subject to these rules, they just didn't have to engage in the games. In other words, these games, it regulates members, people engage subject to amateur competitions. It's not regulating professional sports. And basically saying, you guys, not you guys, the corporations, set the rules and you can enforce the rules. But they don't enforce the rules by taking liberty and property apart from their membership. The only enforcement they have is to expel you and exclude you from games. That's the ultimate authority. That is the ultimate action that they can take. And they can suspend you and they can take away medals and things like this. But this is all related to enforcing the rules of the game. But they're not just enforcing the rules of the game because there's no nexus to sport. They're regulating people's conduct outside of sport and saying, because you did this, and, you know, Ms. Tucker, you went to Thailand and you did something bad in Thailand. You're just not good enough to be a member now of this organization. No, it's not that general. It is that general. No, it seems to me if you did something that reflects your participation in the sport, if you started using drugs in Thailand, the question is, does that reflect on the sport? You're a member of a sport organization. You're a member. It only regulates members and enforces rules. Now, the question is the scope of a rule. You know, every sport talks about you can't be assaulting your wife and then still play sports. It's a bad image for the sport. But that doesn't make this a government action that is exclusively within the government. These are sport rules. These are beyond sport rules. They are governing conduct. This is not field of play rules. This is not controlling the calendar, which is really what the Ted Stevens Act was designed to do, that Olympic NGBs would control the calendar, would set qualifying events. This is regulating conduct of a very personal, private nature in private settings. But in this case, we're talking about, at least in a couple of cases, we're talking about private conduct that's just simply unacceptable to sports competitors, right? You would agree? I don't want to go into the details of that. Right. The private conduct occurred well before the sport code. I know.  And, you know, could have been a factor. But I would think everybody would agree that a person engaged in those conducts should be disqualified from the sport. I don't necessarily agree with that. I think that's why you have a hearing. I think that's why you have a hearing before you ban somebody without notice. I think there are factors that could be brought up in many of those cases and have been brought up in many of those cases. It's not an automatic decision. And that's exactly the point of having a pre-deprivation or a name-clearing hearing. Well, how do you you're in a competition and it has four rounds, and in the second round they test the competitor and the person's doped. Do they have to have a hearing before excluding that person from the game? Yes. They don't. They exclude the person from the game in order to protect the sport, and then the person can challenge that and does challenge it and oftentimes takes a long time, a lot of levels. But the notion that you can't automatically exclude somebody from the game because of a violation, it doesn't make sense. USADA gives a hearing before. So the Safe Sport Code has nothing to do with doping. USADA is the center, the private entity that deals with doping. And USADA follows the same model that the NGBs followed before the Safe Sport Code, which is you can impose temporary measures, you can run a B sample, and then you have your arbitration hearing before the determination of ineligibility. So it is absolutely not correct that you can test positive for doping and that you're automatically out and you can talk about it later. Not automatically, but you can't automatically eliminate them from the competition until they, it's tentative, but you can't have somebody competing who sexually abuses a competitor. He's a coach and he sexually abuses a competitor during the competition. You're going to let him continue? That's why there are temporary measures. And we're not here on the interim measures. There's a big distinction between imposing an interim measure and then there's a process for having a hearing after an interim measure. It's not what we're here about. We're talking about the final determinations that the center makes and the NGBs enforce and they do it before a hearing. In order to find an improper delegation, we need to, there needs to be some delegation of a governmental function or task. And I still haven't heard from you what exactly is the governmental function or task that you are arguing has been improperly delegated here. I heard you say that the names were posted on the World Wide Web. That doesn't seem to me necessarily a governmental function or task. What exactly are you arguing was improperly delegated? Investigation power, adjudication power, the HISA cases talk, they're exactly on point to your question, Your Honor. They say these are traditionally government powers. This is the legislative function. This is the executive function. I would direct your attention to the 2024 Fifth Circuit case on HISA after the FTC made the amendments and fixed the rulemaking part but didn't fix the enforcement part. Those are the governmental functions. Justice Thomas, also in his concurring opinion in Amtrak, talks about the fashioning binding rules as legislative in nature. But Amtrak really focuses on the governmental nature of the particular industry and I think in the context of sports and Olympic sports specifically, the Supreme Court's made clear that that's not the same. I disagree. I think San Francisco talks about the conduct and coordination of sports, not investigating people. What is the conduct of sports separate from who can participate and how can there be a determination of who can participate if there's not some kind of adjudication? Here are some of the other changes that were brought about by the 2018 and 2020 amendments. They are instructed to investigate. They are instructed to work with law enforcement to investigate people. They adjudicate the conduct. They made all members of NGB mandatory federal reporters. So under the 1990 Victim of Child Abuse Act, that act traditionally is for professionals who work on federal land and in federal facilities. But now NGB members are subject to that act. There are federal criminal penalties. That's in the Safe Sport Act. It prohibits other members from transacting business with barred individuals even outside of the context of Olympic sport. For example, I cannot take a lesson, a riding lesson, from somebody who's been barred on my own private property, on my own horse, as an adult. I would be considered aiding and abetting and subject to penalties under the code. These are sweeping powers. This is not who is going to participate in sport today. This is more than that. And, Your Honors, I see that my time is up. Thank you. The absent rebuttal, right? Yes. All right. All right. Mr. Zonis? Good morning. May it please the Court. My name is Joe Zonis. I'm here on behalf of the defendants in the case. There's one crucial thing missing from plaintiff's case, the government. It's totally absent from plaintiff's case. There are no governmental actors here, and there's no delegation of governmental power. And as these are the prerequisites for plaintiff's claims, all of the claims fail. So on the governmental actor front, to be clear, plaintiffs conceded in the district court that neither the United States Olympic and Paralympic Committee nor the United States Equestrian Federation are governmental actors. So they've already conceded that. So that leaves the question, as the Court said below, of whether or not the center is a state actor. And for Plaintiff Navarro, we already know the answer because Plaintiff Navarro arbitrated that issue. And at his arbitration, he argued that the center was a state actor, and the arbitrator determined that the center was not a state actor. And so, as the district court said, he's barred here from arguing that based on res judicata. That res judicata finding is not appealed. For Plaintiff Schaefer, the question was already waived because Plaintiff Schaefer chose not to arbitrate and chose not to raise that question in an arbitration, as she should have, and therefore she has no standing to make that argument here. So that leaves us with Plaintiff Giorgio. And we start, and I think can end, with San Francisco Arts. Conduct and coordination of amateur athletics is not a traditional nor exclusive governmental function. Therefore, at the time, the United States Olympic Committee, now the United States Olympic and Paralympic Committee, is not a state actor. And the Court went even further to say the ASA, the Amateur Sports Act, merely authorized the USOPC, or the USOC at the time, to coordinate activities that have always been performed by private entities. So since 1978, those entities, the USOPC and the national governing bodies, have had the power to do exactly what the Center does now and have had the power to draft the policies and the procedures to determine who can and cannot be eligible to participate in their private membership organizations and have had the power to pull membership from individuals for whom eligibility was no longer proper. And about, how do you respond to the arguments of your friend on the other side that the Safe Sports Act actually goes much further and regulates, allows the private entity or the quasi-private entity to regulate activity that goes beyond sports? It's private, for example, equestrian lessons on private land, coordination with police, investigation, the list that she gave before she sat down. That does sound like activities that go far beyond participation in amateur sports. Yeah. So a couple of different pieces there. I'll start with the broadest piece of that, which is, does Safe Sport look, when it's assessing, Safe Sports' mission is to assess fitness to participate in sport, as it says in the Code. And when assessing fitness to participate in sport, does the Center look at activities outside the sport? Absolutely. So, for example. Well, her argument isn't that, she also says that, but my question is not about what it looks at to determine whether somebody is fit to participate. My question is whether the reach of the authority of the organization extends beyond participation in amateur sports and actually controls individuals' participation in society and other realms. No, no. I mean, the most that the Center can do is say, you can't be a member. You can no longer participate in our private organization over here. They can still, for example, her clients can, and I believe do, train individuals in equestrian sports. You can own horses. You can do, you just can't do it with the five rings above your head anymore. That's all the limitation is. And so, much like the Court said in NCAA with Tarkanian, said UNLV, you can drop out of the NCAA. You don't have to be a member of the NCAA. If you don't want to be bound by these rules, bail. And the same could attain here, which is, if her clients do not want to be bound by the rules of fair play and the rules of safe sport, they need not be members of these organizations. It does not impact whether or not they can still ride horses, for example, or swim or any of the other sports. Or they could still gamble. I mean, if they were found to gamble and then disqualified, they could still gamble as long as there would be maybe laws relating to that. But 100 percent. And to take your doping, it is true that safe sport doesn't handle doping, USADA handles doping. But to take your doping example, Your Honor, in the doping example, you can dope all you want if you're not in the Olympics. Go ahead. Plenty of actors do it to look really good for their movies. So you're allowed to dope. You just can't dope with the five rings over your head. That's all. And the Pan American Games and a few other things, right?  So these private organizations had the power to determine their membership. They had the power, for example, Your Honor, to run a criminal background check, still have this power themselves. And if the criminal background check popped something that gave them concern, they could ban someone from participating in their member organization. In 2017, the center was formed. Because these organizations came to a conclusion, given what I think we all know how things were going in the movement at the time, that this needed to be a centralized organization among these 50 private entities. It needed to be centralized and focused on the welfare of athletes in sport, and particularly minor athletes in sport. And hence the creation of this U.S. Center for Safe Sport. And prior to any legislation, Safe Sport operated for a year. It created its rules, all under private agreements, and because the bylaws of these individual private organizations said, we're going to allow Safe Sport to do this. And so it was all under private agreement. And all Congress really did when they came in with the Safe Sport Act was say, okay, USOPC and the national governing bodies, you used to do this. We understand that you want the center to do this, and we also agree with you that that's a good idea. And so we're going to bless that. It did not give the center any subpoena power. Congress did not give the center any other governmental powers. Unlike the HISA cases, there's no subpoena power, no ability to levy taxes, no ability to execute searches on private land, no way to levy fines. In fact, the center cannot even enforce its own decisions. It requires the national governing bodies enforce those decisions through their private agreements with their membership. The center has none of these powers, none of these governmental powers, nor any power to enforce its own decisions, and at most, all it can do is say, hey, national governing body, this person can no longer be a member of your national governing body. They can go do whatever sports they want, just not with the five rings above their head. As far as the due process arguments, at the heart of these claims is this denial of a predetermination hearing. I'll just briefly address that to say that the center is obviously not a State actor. There is no requirement for predetermination hearing. And as Your Honor was discussing earlier, there is, frankly, no time. And it is an example that I put in the brief, which is if the center has allegations that someone's engaging in inappropriate behavior, for example, a coach with a minor, and that coach is about to get on an airplane, the center's not going to wait around for when they get back to give them a hearing before they bar that person from the sport and prevent them from getting on that plane with that minor. That's the center's mission. And to suggest that the center should wait around to do the hearing first, I think, I'm not going to weigh in on that. The center has no obligation to provide the hearing beforehand. And more importantly, the center provides these hearings fairly quickly afterwards. So the process comes when it is due. As far as the I'll touch on the two other issues before you, which is the Ms. Schaefer's arbitration, under the State's court code, arbitration is the sole and exclusive method to resolve any challenge to the center's eligibility decisions or its processes. Here Ms. Schaefer is attempting to argue that the center does not provide due process in its processes. That is something that she was required to arbitrate in the first instance, as Mr. Navarro did in his arbitration. She failed to do so. Here Ms. Schaefer argues that she's excused from arbitrating issues regarding statutory construction and excused from arbitrating issues of constitutionality. This very circuit has in McDonald said that statutory interpretation does not justify bypassing arbitration, and in Nations Bank that constitutional claims are not exempt from exhaustion requirements. So the court's decision that Ms. Schaefer failed to exhaust her administrative remedies and her claims are therefore barred should likely be affirmed. And finally, the USOPC standing issues. The district court concluded that plaintiffs failed to allege any causation for redressability. I think as the district court found that it's true, they did not allege that the USOPC had any role in the eligibility decision. It didn't. It did not allege that the USOPC had any role in imposing the sanctions. It didn't. It did not allege that the USOPC published their names. It didn't. Those were all acts taken by the center. Nor did they allege that the USOPC had any involvement in enforcing the sanctions. Again, USOPC didn't. Those were enforced by the U.S. Equestrian Federation. Congress noted that so it's unclear in this instance what the USOPC could have done on the redressability front. The USOPC has no power to do anything in those circumstances, particularly now under the new legislation which prohibits it from interfering in the center's operations. Thank you very much. Mr. Koppel. Good morning, Your Honors. May it please the Court. I'm Josh Koppel for the United States. I want to start with Plaintiff's private non-delegation claim. That claim fails at step one because safe sport isn't exercising governmental power. The U.S. Olympic and Paralympic Committee created safe sport on its own without governmental direction to coordinate oversight and response to the problem of abuse in amateur sports affiliated with the Olympic movement. Congress recognized and memorialized safe sport's functions a few years later, but that doesn't change the fact that safe sport is fundamentally a private actor and is not exercising government power. The Supreme Court recognized in San Francisco Arts and Athletics that the coordination and conduct of amateur sports is a private function, not a governmental one, and neither is the development of policies related to the prevention of abuse within a private organization. Many private organizations have policies and procedures to deal with abuse. Many of those will reach — will recognize conduct that occurs outside of the organization because it identifies the type of person or people that they don't want within their organization, and they will exclude the person from their organization on that basis. And that is all the safe sport is doing. But in those — in those circumstances, are there statutes that codify those rules as essentially mandates or binding? Is there any other statute like this one, like the Safe Amateur Sports Act? Is this unique? I'm not sure if there are others like that. There are other statutes that recognize not conduct standards, but other kinds of standards developed by private organizations. For instance, there are statutes that recognize — But these are — this is the — not recognizing standards developed by private organizations. This has actually the procedure and the standards set forth at length and in detail articulated, and then, in fact, there's a provision that says the policies and procedures developed under the subsection shall apply as though they were incorporated in and made part of the Act. And so it does seem to be a different kind of statute than anything else, at least that I'm aware of. So the Act does not say private individuals must comply with the policies and procedures developed by Safe Sport. What it does is it says — it references Section 22524, which is the general duties of national governing bodies. So in that section, Congress has regulated the national governing bodies that are authorized to represent the United States in international competition. And it says one more obligation of the national governing bodies is they have to agree to abide by the Safe Sport policies and procedures, if they want to be a national governing body. If USEF decides it doesn't want to abide by the procedures of Safe Sport, it doesn't have to. The U.S. Olympic Committee simply won't recognize it anymore as a national governing body authorized to send individuals to the Olympics. But USEF can continue to organize amateur athletic sports. And there are organizations, amateur athletic organizations, that don't abide by Safe Sports policies and procedures. They organize sports. They're just not recognized national governing bodies. They don't choose who to nominate to go to the Olympics or other international competitions. And when Safe Sport sanctions an individual, the sanction is, again, you can't compete with the national governing body. That individual can compete with other athletic leagues, can train individuals outside of the parameters of the national governing body and the Olympic movement. And so in that way, what Safe Sport is doing is fundamentally a private function. It's regulating who can be within this private organization. It's not regular. There's no criminal liability. There's no civil liability. And that's what really distinguishes this, for example, from the HISA cases. And if Safe Sport oversaw a different kind of entity that wasn't amateur sports, I take your argument to be that because this is amateur sports, it's not a governmental function. If it was, for example, overseeing who can fly an airplane or who can drive a train, then that might be a governmental function, and there could be potentially a nondelegation issue there. No, I don't think that it is — that the problem is that it's just — I'm sorry. I don't think that the distinction is that this is amateur sports as opposed to something else. I think the distinction is that it's regulating conduct within a private organization. There's no civil and criminal liability for violating Safe Sports policies and procedures. You're not excluded from the entire industry. You're just excluded from the private organization, which the Supreme Court has recognized continues to be a private organization. Well, I think your colleague on the other side says this is like Amtrak. So why is it not like Amtrak? So Congress set up the U.S. Olympic Committee as an independent corporation. The Supreme Court recognized that the U.S. Olympic Committee continues to be a private actor, and the U.S. Olympic Committee then on its own created Safe Sport as an independent body to govern, to create policies and procedures to deal with abuse. Those policies and procedures continue to be private policies and procedures even after Congress has recognized and memorialized Safe Sports' role. Safe Sports — the sanctions that Safe Sports can impose are no different now than they were in 2017 before the amendments to the Amateur Sports Act. They continue to simply be exclusion from the private organization that the national governing bodies and the U.S. Olympic Committee. Just very quickly on the issue of the due process claim. The Due Process Clause, of course, protects individuals only from governmental action, not from private action. Safe Sports is a private — as we discussed, Safe Sports is a private entity that doesn't exercise any governmental function, and the government has not coerced Safe Sports into not giving a pre-deprivation hearing. Safe Sports on its own determines whether it wants to give a hearing before or after it imposes a sanction, and so the choice not to give a pre-deprivation hearing in these circumstances can only be attributed to Safe Sports. It can't be attributed to the government. And so there is no due process violation. Happy to answer any other questions. Otherwise, we ask that the Court firm the decision below. Thank you, Mr. Copp. All right. Ms. Tucker, you have some rebuttal. Thank you, Your Honor. I want to take this point by point. First, we haven't discussed Count 5, which is a facial challenge to the statute under the Due Process Clause. Congress is a state actor, obviously. So when Congress passes a statute that on its face violates a person's due process rights, it's unconstitutional. In this case — Well, that's pretty broad. What about the National Bank Act? I mean, we charter banks, private banks, all across the country. Here's how they violate — here's how it's facially invalid. Congress has mandated that when the center makes a decision to bar an individual — and I'm not talking again about temporary measures. We keep hearing the airplane example. That's got nothing to do with this case. When Congress bars somebody and makes them ineligible permanently or for a period of time — I'm sorry, when the center does that, Congress has said their name goes on the World Wide Web. That is the wall of shame. It is stigmatic. It is a liberty interest. The change in status is the stigma plus. Congress has not required — You know that when you become a member. In other words, the idea, part of enforcing exclusion from the sport is to make sure that the person who has been excluded doesn't reengage in the sport in some context where they don't know about it. And it's — Your Honor, respectfully — I mean, maybe you could sue them for defamation of torts, but that's not State action. Well, you don't need State action because you have Congress that's passed a statute that has said — It's just authorizing the corporation. It's a State-chartered corporation, a Federally-chartered corporation that charters a private corporation and tells them to make the rules and tells them to enforce the rules, and the ultimate sanction is exclusion from the sport. That's not what's happening. Congress has directed the center to put their names on the wall and change their status and has not told the center to give a pre-deprivation hearing. Leaving it up to the center, as my colleague just argued, makes it worse, not better. Leaving it up to the center is not the way to fix the facially invalid statute. Congress needs — Well, leaving it up to the center undercuts your delegation argument. No, I don't think it does. This is kind of one of those rare things. Normally, there is sort of a conflict between the Fifth Amendment and non-delegations, a little bit of an either-or. This is one of those situations where, as my colleague just said, Congress blessed this arrangement. Congress came in after the fact and said, hey, this is great, and then it added a bunch of stuff that I listed earlier. With regard to the subpoena power, that's irrelevant. The EEOC doesn't have subpoena power. It's governmental, clearly governmental. So that's kind of a red herring. And I think it's important to remember, to Judge Niemeyer's point, that when Congress blessed this arrangement, Congress also granted civil immunity to the center. So, you know, on the one hand, it has no governmental oversight. On the other hand, it's offering significant governmental protection, and it's offering significant governmental mandates that I listed earlier. And so it's almost as if, in this case, they wrote the worst possible statute, where they went too far in some ways and not far enough in another. But here's how it works. Either there's oversight or there's a pre-deprivation hearing. It's not hard to fix this. But for whatever reason, seven years down the road, we can't seem to get this fixed. I would also mention that with regard to my colleague's comments that my clients can still teach writing, again, they cannot teach on private land to people who are members of USEP. Because they can't.  The sanction for everything is membership. The sanction isn't a criminal or civil sanction. There is no civil. Basically, it's a rule that leads ultimately the most severe sanction that they can impose is exclusion of membership. Well, they don't teach. They're severely limited in their employment now because people who take lessons for them, from them, who happen to be members of USEP, will be liable potentially for aiding and abetting. So this notion of, oh, we're just not under the five rings anymore, but everything else is hunky-dory, is simply not the case. And, in fact, the Center extends sanctions and interim measures and other types of punishments on private land. If persons don't want to be members and don't intend to participate in the Olympic movement or the Pan American Games or whatever these national games that involve the membership, they don't have to belong. And they can do whatever they want, I mean, in this regard. The idea is people do want that membership because they do want to have the participation or the potential participation in the activities that lead to participation in Olympic games. But I don't understand the argument that all of this is government action simply when the sanction, the ultimate sanction, is exclusion of membership from a private corporation. Your Honor, that's premised on some factual misunderstandings. So this is not simply prospective in nature. This statute was not passed on a prospective basis, as was HISA. HISA, Congress specifically said, look, you're going to investigate and adjudicate and do all of these things, you being the authority, and you're going to do it on a prospective basis. These – this conduct has been investigated going back to long before when somebody signed up their membership agreement, there was a safe sport code. Now, let's take just the hypothetical. If it is private, you have your private poker club, and all of a sudden you decide you don't want a member of the club because one member 10 years ago engaged embezzlement. And you say he's out. The club says he's out because we don't want somebody engaged in embezzlement. Now, where is the – where do the courts come in and say the poker club can't do that? Well, because if Congress writes a statute that says, hey, the poker enforcement embezzlement center is now in charge of the poker club and gets to write the rules for the poker club and tell the poker club what participants can and cannot be in there. But the poker club already is making its rules. Right. And it does – Then why did Congress act? So that's the problem here. Congress stepped in it. Congress waded into this area of regulation well beyond what it had ever done before It's a lengthy statute. To Judge Berner's point, it is a statute like no other. That's why we're here, because there is no other statute that anyone can find that does what this one does. It has not simply said, oh, you're the National Veterans War thing and you can have your bylaws and go forth and you're a patriotic organization. I'm sorry. May I finish my answer? Thirty seconds. Okay. It goes well beyond that. If you look at the length and breadth of the entire Safe Sport Act, those two amendments, you will see that this is not simply Congress, you know, letting the poker club decide who's going to be in the poker club. Okay. Thank you. Thank you. We'll take a short recess, come down to Greek Council. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Nicole G. Berner